IN THE UNITED STATES DISTRICT COURT

DISTRICT OF UTAH - CENTRAL DIVISION

FILED
U S DISTRICT COURT

2006 JUL 12 A 10: 35

DISTRICT OF UTAH

BY:_____
DEPUTY CLERK

|  |  |
|---|---|
| ROBERT SHERRY,<br><br>     Plaintiff,<br><br>vs.<br><br>IRON COUNTY; GARFIELD COUNTY;<br>IRON/GARFIELD COUNTIES<br>NARCOTICS TASK FORCE; TONY<br>GOWER, in his official and individual<br>capacity; KEITH MILLET, in his official and<br>individual capacities; and JOHN DOES I-IX,<br><br>     Defendants. | **OPINION AND ORDER**<br><br>Case No. 2:05-CV-843<br><br>Judge Dee Benson |

## I. INTRODUCTION

Plaintiff Robert Sherry brings this civil rights suit under 42 U.S.C. section 1983 claiming

that Defendants are liable for damages resulting from violations of his Fourth Amendment rights.

Before the Court are Defendants' motions for summary judgment and Plaintiff's cross motion for

partial summary judgment. Oral argument on the motions was heard on June 23, 2006, after the

filing of written briefs. Having considered the parties' arguments, briefs, and the relevant law,

the Court GRANTS Defendants' motions and DENIES Plaintiff's motion for the reasons set

forth below.

## II. BACKGROUND

On June 25, 2004, Officer Larry Ball, an Investigator for the Utah Motor Vehicle

Enforcement Division, stopped Mr. Sherry, who was traveling in his vehicle on 200 North in

Cedar City, Utah, because Mr. Sherry's vehicle had no visible registration. Officer Ball asked

Mr. Sherry for his driver's license, registration, and proof of ownership. Mr. Sherry, however,

had no current registration and was driving on a suspended license.  Officer Ball ran a warrants check on Mr. Sherry and discovered two outstanding warrants for his arrest.

Iron County Sheriff Deputy Tony Gower, who is assigned to work with the Iron/Garfield Counties Narcotics Task Force ("Task Force"), responded to the scene as backup.  Both he and Officer Ball approached Mr. Sherry's vehicle and placed him under arrest.

At Officer Ball's request, Deputy Gower then searched Mr. Sherry's vehicle and inventoried its contents.  Inside Mr. Sherry's vehicle, Deputy Gower discovered, among other things, approximately 54 grams of methamphetamine, three small baggies, and an electronic scale.  Mr. Sherry was subsequently booked on the outstanding warrants, the motor vehicle violations, possession of methamphetamine with intent to distribute, and possession of drug paraphernalia.  On the citation, Officer Ball indicated that Mr. Sherry's address was 4601 North Highway 91, Enoch, Utah.

Deputy Gower recognized Mr. Sherry from his work on the Task Force.  And Deputy Gower was aware that Mr. Sherry frequented a home located at 140.5 North 800 West in Cedar City that was under Task Force surveillance for suspected drug activity.  As Deputy Gower left the scene of the traffic stop, he called Commander Keith Millet, a Cedar City Police Sergeant and Commander of the Task Force, to inform him of Mr. Sherry's traffic stop and the discovery of drugs. Deputy Gower told Commander Millet that upon Mr. Sherry's arrest Mr. Sherry indicated that he was coming from a house just south of 200 North on 800 West.  Mr. Sherry, however, did not give an exact address.[1]

---

[1]Deputy Gower later testified that he did not remember asking for or getting Mr. Sherry's address. But on Commander Millet's investigation report, he noted that Mr. Sherry had told Agent Gower that he lived with a friend on 800 West.

Commander Millet had seen Mr. Sherry come and go from Darrell Weeks' basement apartment at 140.5 North 800 West, and he knew that Mr. Sherry had some ties to that location. Commander Millet called the Iron County Attorney's Office to obtain a search warrant for Mr. Weeks' apartment. While Commander Millet was waiting for the warrant, he drove by Mr. Weeks' apartment. Commander Millet observed Mr. Weeks standing in the carport, and he stopped to talk with him. Commander Millet explained to Mr. Weeks that Mr. Sherry had been arrested on drug charges, and Mr. Weeks informed Commander Millet that he and Mr. Sherry were friends. Mr. Weeks indicated that although Mr. Sherry stayed overnight at his apartment once in a while, Mr. Sherry did not live there. Mr. Weeks told Commander Millet that he did not know where Mr. Sherry resided.

While Commander Millet spoke to Mr. Weeks, Mr. Sherry's parents stopped by the apartment looking for Mr. Sherry. Mr. Sherry's parents told Commander Millet that Mr. Sherry lived with Mr. Weeks at that apartment. Mr. Weeks, however, again told Commander Millet that Mr. Sherry did not live there. But Commander Millet thought he might by lying. Commander Millet believed there was "a good possibility" that Mr. Sherry actually lived with Mr. Weeks, but Commander Millet testified that his suspicion was not confirmed until after the officers later searched the apartment and found Mr. Sherry's wallet and identification inside.

After Mr. Weeks insisted that Mr. Sherry did not live at the 800 West apartment, Commander Millet called Mr. Weeks' landlord for verification. The landlord confirmed that Mr. Sherry was not living with Mr. Weeks and that Mr. Weeks was the sole tenant of the basement apartment.

Mr. Weeks then consented to a search of his apartment. Commander Millet and several other officers, including Deputy Gower, followed Mr. Weeks downstairs into the apartment. Mr.

Weeks went straight into his bedroom, retrieved a box containing drugs and drug paraphernalia, and handed the box to the officers. Commander Millet then asked for permission to search the rest of the apartment, and Mr. Weeks consented. Thereafter, the officers continued to search the residence, including a small bedroom under the stairs. Deputy Gower testified that this bedroom was separated from Mr. Weeks' bedroom by a board placed to divide the space.

Upon entering the second room, the officers observed, in plain view, ammunition and a scale. Agent Benjamin Rowley, an agent with the Office of Adult Probation and Parole in Cedar City, opened a desk drawer and discovered a stash of illegal drugs and drug paraphernalia. Agent Gower assisted Agent Rowley in an inventory of the items found in that room. During this process, Agent Gower discovered a wallet containing a picture identification of Mr. Sherry. The officers questioned Mr. Weeks about Mr. Sherry's wallet, and Mr. Weeks informed them that Mr. Sherry left it there because he stayed there once in a while.

As a result of the apartment search, Mr. Sherry was charged with additional charges of possession of drugs with intent to distribute and possession of drug paraphernalia. While under criminal prosecution by the State of Utah, Mr. Sherry moved to suppress the evidence found at both the traffic stop and at Mr. Weeks' apartment. Judge Eves of the Utah State Fifth Judicial District denied Mr. Sherry's motion with respect to the evidence found in his car, but suppressed the evidence found in the apartment. Judge Eves ruled that "[g]iven the circumstance, Mr. Weeks certainly didn't have any authority to consent to the search of Mr. Sherry's quarters and, therefore, the objects found there were inappropriately located and seized."

Mr. Sherry went to trial on the drug charges from the traffic stop. A jury found him guilty of possession with intent to distribute and possession of drug paraphernalia. Before he

4

was sentenced, Mr. Sherry tested positive for marijuana and methamphetamine. His bail was revoked, and he was committed to the custody of the sheriff pending sentencing.

On October 7, 2005, Mr. Sherry filed the present action, alleging damages for the alleged violation of his Fourth Amendment rights when police officers searched his room at Mr. Weeks' apartment without a warrant or proper consent.

### III. DISCUSSION

Mr. Sherry and Defendants all move for summary judgment. Summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c).

Defendants claim that the acts of the individual law enforcement officers were protected by qualified immunity. Qualified immunity is "'an entitlement not to stand trial or face the other burdens of litigation.'" Holland v. Overdorff, 268 F.3d 1179, 1185 (10th Cir. 2001) (quoting Mitchell v. Forsyth, 472 U.S. 511, 526 (1985)). Therefore, courts have "stressed the importance of resolving immunity questions at the earliest possible stage in litigation." Id. "Qualified immunity shields government officials performing discretionary functions from individual liability under 42 U.S.C. [section] 1983 unless their conduct violates 'clearly established statutory or constitutional rights of which a reasonable person would have known.'" Baptiste v. J.C. Penney Co., 147 F.3d 1252, 1255 (10th Cir. 1998) (quoting Harlow v. Fitzgerald, 475 U.S. 800, 818 (1982)). This affirmative defense protects "all but the plainly incompetent or those who knowingly violate the law." Holland, 268 F.3d at 1185 (quotations and citation omitted). When a defendant raises a qualified immunity defense, "a heavy two-part burden must be overcome by the plaintiff." Phillips v. James, 422 F.3d 1075, 1080 (10th Cir. 2005). The plaintiff bears the

burden of "(1) coming forward with sufficient facts to show that the defendant's actions violated a federal constitutional or statutory right and (2) demonstrating that the right violated was clearly established at the time of the conduct at issue." Holland, 268 F.3d at 1185.

### 1. Violation of Constitutional Right

The Court must begin by determining whether Mr. Sherry has demonstrated a violation of his constitutional rights. Mr. Sherry first argues that this Court, under the law of the case doctrine, is precluded from reexamining whether Defendants violated his Fourth Amendment rights. Mr. Sherry asserts that this Court is compelled to grant his motion for partial summary judgment because Judge Eves of the Utah State Fifth Judicial District, in suppressing evidence obtained during the search of Mr. Weeks' apartment, already established that Mr. Sherry's constitutional rights were violated by Defendants.

The law of the case doctrine "provides that 'when a court decides upon a rule of law, that decision should continue to govern the same issues in subsequent stages of the same case.'" Robbins v. Wilkie, 433 F.3d 755, 764 (10th Cir. 2006) (quoting Arizona v. California, 460 U.S. 605, 618 (1983)) (emphasis added). Although courts "are quick to recognize the flexibility of the rule and are permitted to overturn erroneous rulings as the underlying policy of the rule is one of efficiency, not restraint of judicial power," MacArthur v. San Juan County, 391 F. Supp. 2d 895, 1034 (D. Utah 2005), the doctrine has no application to this case. This case is not a "later stage" in the criminal case that was before the state trial judge. See U.S. v. Phillips, 59 F. Supp. 2d 1178, 1188 (D. Utah 1999) ("Because this is not a later stage in the same case, the doctrine of the law of the case has no application here."). Because the Court concludes that the law of the case doctrine is not applicable to the present civil matter, the Court is not bound by Judge Eves' previous ruling in Mr. Sherry's criminal proceeding.

6

Similarly, Mr. Sherry may not offensively use collateral estoppel in this case. In <u>Griffin</u> <u>v. Strong</u>, 739 F. Supp. 1496 (D. Utah 1990), the federal district court ruled that a state court determination of a Fourth Amendment question in a criminal proceeding did not have preclusive effect in a subsequent section 1983 claim in federal court. <u>See id.</u> at 1503. In <u>Griffin</u>, the Utah Court of Appeals had held that the criminal defendant's confession was involuntary and his arrest was unlawful. The federal district court, however, determined that application of collateral estoppel by the criminal defendant turned civil plaintiff was inappropriate because the party against whom collateral estoppel was asserted, a defendant police officer, did not have a "full and fair opportunity to litigate the issues of the current [civil] case in the course of the . . . criminal trial." <u>Id.</u> The court pointed out that the police officer, who was a witness in the criminal case but a named defendant in the civil matter, did not have the same interests at stake in the criminal case, and the burden of proof and available defenses were different in the subsequent civil case. <u>See id.</u> In the criminal case brought by the state, the defendant officer's interests were not adequately protected or represented. <u>See id.</u>; <u>see also</u> <u>Kinslow v. Ratzlaff</u>, 158 F.3d 1104, 1106 (10th Cir. 1998) (concluding in a similar matter that "[b]ecause the officers were neither parties nor privies to the prior state court determination and, therefore, did not have a full and fair opportunity to litigate in state court the constitutionality of the issues in this section 1983 action, the doctrine of issue preclusion does not apply to this case"). Therefore, the defendant officer was not precluded from fully challenging the Fourth Amendment issues in the section 1983 lawsuit. Similarly, this Court concludes that Defendants are not estopped by Judge Eves' suppression ruling from challenging Mr. Sherry's Fourth Amendment claims in this matter.

Defendants argue, and the Court agrees, that Mr. Sherry's Fourth Amendment rights were not violated when the Defendant police officers searched Mr. Weeks' entire apartment with the

consent of Mr. Weeks.  "[W]arrantless searches are *per se* unreasonable under the Fourth Amendment."  U.S. v. Lopez, 777 F.2d 543, 550 (10th Cir. 1985).  This rule, however, is subject to several exceptions.  See id.  A warrantless entry and search of a home by police officers does not violate the Fourth Amendment "if the officers have obtained the consent of a third party who possesses common authority over the premises."  Illinois v. Rodriguez, 497 U.S. 177, 179 (1990).  "A third party's consent to search is valid if that person has either the 'actual authority' or the 'apparent authority' to consent to a search of that property."  United States v. Kimoana, 383 F.3d 1215, 1221 (10th Cir. 2004).

Mr. Sherry would have the Court apply the test for actual authority adopted by the D.C. Circuit in United States v. Whitfield, 939 F.2d 1071, 1074 (D.C. Cir. 1991), requiring proof of mutual use from joint access *and* control.  The Tenth Circuit in United States v. Rith, 164 F.3d 1323, 1329 (10th Cir. 1999), however, rejected application of the Whitfield test, and clarified that the Supreme Court's test for actual authority, articulated in United States v. Matlock, 415 U.S. 164, 171 (1974), should be read in the disjunctive.  The Rith court declared that "a third party has authority to consent to a search of property if that third party has either (1) mutual use of the property by virtue of joint access, *or* (2) control for most purposes over it."  Rith, 164 F.3d at 1329 (emphasis added).  Therefore, "the gravamen of the 'actual authority' rule is that it is reasonable to recognize that 'any of the co-habitants has the right to permit the inspection in his own right and . . . the others have assumed the risk that one of their number might permit the common area to be searched.'"  Kimoana, 383 F.3d at 1222 (quoting Matlock, 415 U.S. at 171).

Mutual use of property by virtue of joint access, the Tenth Circuit explained, "is a fact-intensive inquiry which requires findings by a court that the third party entered the premises or room at will, without consent of the subject of the search."  Rith, 164 F.3d at 1329-30.  The

Court has insufficient facts before it to determine whether Mr. Weeks had mutual use of Mr. Sherry's quarters in the apartment at 140.5 North 800 West by virtue of his joint access.

The test for "control for most purposes," in contrast to the mutual use inquiry, "is a normative inquiry dependent upon whether the relationship between the defendant and the third party is the type which creates a presumption of control for most purposes over the property by the third party." Id. at 1330. "If a relationship creates such a presumption of control and is unrebutted, the third party has authority to consent to a search of the property." Id. The Tenth Circuit explained that relationships giving rise to a "presumption of control of property include parent-child relationships and husband-wife relationships." Id. "A simple co-tenant relationship," in contrast, "does not create a presumption of control and actual access would have to be shown." Id. This statement by the court, however, "does not stand for the proposition that a co-tenant relationship creates a rebuttable presumption that neither co-tenant has control over the property of the other." United States v. Abdenbi, 361 F.3d 1282, 1290 (10th Cir. 2004). In determining whether a particular relationship raises a presumption of control for most purposes, the Tenth Circuit "admonishes that authority to search is premised on a 'practical understanding' of the way parties have access to and share the searched property." Rith, 164 F.3d at 1330.

As the Court explains further in the section that follows, it is not clear how courts in this circuit, much less law enforcement officers making on-the-scene judgments, are to treat a living arrangement like that between Mr. Weeks and Mr. Sherry for purposes of the "control for most purposes" analysis. Mr. Weeks and Mr. Sherry, it can be argued, are not in a "simple co-tenant" relationship. Mr. Weeks was the sole lawful tenant of the 800 West apartment. From all accounts, Mr. Sherry was merely "staying" at Mr. Weeks' apartment and was not providing any payment to Mr. Weeks in the form of rent. Mr. Sherry's makeshift living quarters were created

9

by the placement of a board at the end of Mr. Weeks' bedroom. This Court, therefore, concludes that Mr. Weeks could be said to have control for most purposes over the entire basement apartment on 800 West.

Regardless, a search performed with the consent of a third party who lacks actual authority is nonetheless valid if the police officers reasonably acted on the third party's apparent authority. In this case, the Court concludes that Mr. Sherry's constitutional rights were not violated because the police officers reasonably relied on Mr. Weeks' apparent authority to consent to the search.

In <u>Illinois v. Rodriguez</u>, the Supreme Court explained that "in order to satisfy the 'reasonableness requirement' of the Fourth Amendment, what is generally demanded of the many factual determinations that must regularly be made by agents of the government . . . is not that they always be correct, but that they always be reasonable." 497 U.S. at 185. "Because many situations which confront officers in the course of executing their duties are more or less ambiguous, room must be allowed for some mistakes on their part. But the mistakes must be those of reasonable men, acting on facts leading sensibly to their conclusions of probability." <u>Id.</u> (quotations and citation omitted). This general rule applies to facts bearing upon the authority to consent to a search. <u>See id.</u> "Whether the basis for such authority exists is the sort of recurring factual question to which law enforcement officials must be expected to apply their judgment; and all the Fourth Amendment requires is that they answer it reasonably." <u>Id.</u> The apparent authority test, therefore, "for determining the reasonableness of the officer's belief is an objective one: '[W]ould the facts available to the officer at the moment . . . warrant a man of reasonable caution [to believe] that the consenting party had authority over the premises?'" <u>Kimoana</u>, 383 F.3d at 1222 (quoting <u>Rodriguez</u>, 497 U.S. at 188) (alteration in original). If so, the search is

10

valid.  Where a police officer is presented with "ambiguous facts related to authority, he or she has a duty to investigate further before relying on the consent."  Id.  In other words, "[p]olice officers must evaluate the surrounding circumstances in order to determine whether a reasonable person would 'act upon [the invitation] without further inquiry."  Id. (alteration in original).

The Court finds that the totality of the circumstances in this case demonstrates that the police officers had sufficient information to reasonably believe that Mr. Weeks had proper authority to consent to a search of the entire apartment on 800 West.  When Commander Millet approached Mr. Weeks at his apartment and asked him about Mr. Sherry, Mr. Weeks told Commander Millet that he did not know where Mr. Sherry lived.  Mr. Weeks informed Commander Millet that he and Mr. Sherry were friends and that Mr. Sherry stayed overnight at his apartment once in a while.

After Mr. Sherry's parents told Commander Millet that Mr. Sherry lived with Mr. Weeks at that apartment, Commander Millet obtained further assurance from Mr. Weeks that Mr. Sherry did not live there.  Commander Milllet thought Mr. Weeks might by lying, so he took the extra precaution of calling Mr. Weeks' landlord to verify that Mr. Sherry did not live there.  The landlord confirmed that Mr. Sherry was not living with Mr. Weeks in the basement apartment and that Mr. Weeks was the sole tenant.  Mr. Weeks continued to insist that Mr. Sherry did not live in the apartment and consented to a search of "his" premises.  At that point, the officers searched Mr. Weeks' apartment.  It was not until the police officers were inventorying objects found in the second room that the officers discovered a wallet containing Mr. Sherry's photo identification.

The Court concludes that an objectively reasonable police officer in Commander Millet's position could have and would have relied on Mr. Weeks' apparent authority to consent to a

11

search of the entire apartment. Based upon the facts presented to Commander Millet, it was reasonable to assume that Mr. Weeks was the only person with a legitimate privacy interest in the 800 West apartment. Because the police officers' reliance on Mr. Weeks' consent was justified, Mr. Sherry's constitutional rights were not violated by the officers' search of Mr. Weeks' entire apartment.

## 2. Clearly Established

Even if Mr. Sherry's constitutional rights had been violated by the officers' search of Mr. Weeks' apartment, the Defendant police officers are entitled to qualified immunity because Mr. Sherry's right to be free from that search was not clearly established. The Supreme Court in Saucier v. Katz, 533 U.S. 194 (2001), explained that "[i]f the law did not put the officer[s] on notice that [their] conduct would be clearly unlawful, summary judgment based on qualified immunity is appropriate." Id. at 202. "A right is 'clearly established' if Supreme Court or Tenth Circuit case law exists on point or if the clearly established weight of authority from other circuits found a constitutional violation from similar actions." Peterson v. Jensen, 371 F.3d 1199, 1202 (10th Cir. 2004) (quotations and citation omitted). In other words, "[t]he contours of the right must be sufficiently clear that a reasonable officer would understand that what he is doing violates that right." Baptiste, 147 F.3d at 1255 (alteration in original); see also Gross v. Pirtle, 245 F.3d 1151, 1155 (10th Cir. 2001) (stating that qualified immunity protects "'all but the plainly incompetent or those who knowingly violate the law'" (citation omitted)). The relevant inquiry must be "whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted." Saucier, 533 U.S. at 202.

In this case, such "contours" of Mr. Sherry's rights were not "sufficiently clear that a reasonable official" in Commander Millet's position "would understand that what he [was] doing

12

violate[d] [those] right[s]." Id.  As the Court explained above with regard to Mr. Weeks' actual

authority to consent to the search of his entire apartment, determining whether Mr. Weeks had

mutual use of Mr. Sherry's alleged living quarters is a "fact intensive" inquiry, see Rith, 164

F.3d at 1329-30.  There is no per se rule that would have put the officers on notice that they were

violating Mr. Sherry's constitutional rights by relying on Mr. Weeks' consent.  Although Mr.

Sherry relies on case law from other circuits to argue that the officers should have known that

Mr. Weeks did not have common authority to consent to the search, Mr. Sherry has not

demonstrated any Supreme Court or Tenth Circuit case law on point or the clearly established

weight of authority from other circuits that demonstrates that the officers' actions were clearly

prohibited.  See Peterson, 371 F.3d at 1202.

Mr. Sherry cites to United States v. Duran, 957 F.2d 499 (7th Cir. 1992), and United

States v. Heisman, 503 F.2d 1284 (8th Cir. 1974), in support of the proposition that two friends

inhabiting a two-bedroom apartment might reasonably expect to maintain exclusive access to

their respective bedrooms without making this expression clear to one another.  The facts of

these cases, however, are distinguishable.  Other courts in addressing facts like those in this

case—where a third party allows another to reside at his residence—have held that the third party

did have sufficient control over the premises to consent to a search of the premises.  For

example, in United States v. Hall, 979 F.2d 77 (6th Cir. 1992), the Sixth Circuit held that a third

party had common authority to consent to the search of his roommate's bedroom.  See id. at 79.

In that case, the third party allowed the roommate to stay at his residence in exchange for the

roommate's help on the third party's farm.  See id. at 78.  The third party, who gave officers

consent to search, owned the house and all the furniture in the roommate's room, and he had

personal items stored in an adjacent room which he could access through the roommate's room.

The roommate's room was never locked and there was never an agreement or understanding that the third party was not to enter the room.  See id.  The third party, however, never entered his roommate's room when the roommate was not home.  See id.  Similarly, in Woodward v. United States, 254 F.2d 312 (D.C. Cir. 1972), the D.C. Circuit determined that a householder who had taken in a non-paying guest was entitled to consent to a search of the guest's bedroom.  See id. at 313; see also U.S. v. Novick, 450 F.2d 1111, 1112 (9th Cir. 1971) (determining search was reasonable where property owner consented to search of non-paying guest's room).

Like the third party in Hall, Mr. Weeks allowed a roommate, Mr. Sherry, to live at his residence.  Mr. Hall was the only actual and lawful tenant of the apartment and he had access to the entire apartment at all times.  Although the record does not indicate that Mr. Weeks ever entered Mr. Sherry's alleged living quarters when Mr. Sherry was not home, Mr. Sherry's room was merely separated from Mr. Weeks' room by a board, and Mr. Weeks could have easily entered whenever he wished.  Further, like the homeowner in Woodward, it appears from the record that Mr. Weeks paid the rent on the 800 West apartment without contribution from Mr. Sherry.  While the Tenth Circuit has stated that a "simple co-tenant relationship" does not "create a presumption of control and actual access would have to be shown," Rith, 164 F.3d at 1329-30, it has also recognized that this statement "does not stand for the proposition that a co-tenant relationship creates a rebuttable presumption that neither co-tenant has control over the property of the other," Abdenbi, 361 F.3d at 1290.  Furthermore, Mr. Sherry has not demonstrated any Tenth Circuit or Supreme Court decision that addresses the type of co-tenant relationship present in this case or that explicitly describes the amount of "further inquiry" required of an officer facing ambiguous facts related to authority.  It could not, therefore, have been clear to Commander Millet, or any other officer, that searching the entire 800 West apartment with the

14

consent of Mr. Weeks, who had apparent, sole authority over the premises would constitute a constitutional violation. The Supreme Court acknowledged that reasonable mistakes can be made and that "[i]t is sometimes difficult for an officer to determine how the relevant legal doctrine . . . will apply to the factual situation the officer confronts." Id. at 205. Therefore, under applicable precedent, Commander Millet was not put on notice that his decision to search Mr. Weeks' apartment would be unreasonable. Thus, Mr. Sherry has failed to demonstrate that the officers' actions were prohibited by clearly established law.

### 3. Liability of Governmental Entities

Mr. Sherry's claims against Iron County, Garfield County, and the Iron/Garfield Counties Narcotics Task Force stem from the individual Defendants' search of Mr. Sherry's living quarters. A municipality, however, "may not be held liable where there was no underlying constitutional violation by any of its officers." Hinton v. City of Elwood, 997 F.2d 774, 782 (10th Cir. 1993). And even if the municipality's individual officers committed a constitutional violation, "[a] municipality may not be held liable under [section] 1983 solely because its employees inflicted injury on the plaintiff." Id. at 782. "[A] municipality can be found liable under [section] 1983 only where the municipality *itself* creates that constitutional violation at issue. *Respondeat superior* or vicarious liability will not attach under [section] 1983." City of Canton v. Harris, 498 U.S. 378, 385 (1989). Moreover, "[i]t is only when the 'execution of the government's policy or custom . . . inflicts the injury' that the municipality may be held liable." Id. (citation omitted). To establish municipal liability, therefore, Mr. Sherry must show "(1) the existence of a municipal policy or custom, and (2) that there is a direct causal link between the policy or custom and the injury alleged." Hinton, 997 F.2d at 682.

15

"When the asserted policy consists of the failure to act, the plaintiff must demonstrate that the municipality's inaction was the result of 'deliberate indifference' to the rights of its inhabitants." Id. (quotations and citation omitted). Liability attaches "'where—and only where—a deliberate choice to follow a course of action is made from among various alternatives' by city policymakers." Harris, 498 U.S. at 388 (citation omitted). Id. Finally, "'deliberate indifference may be found absent a pattern of unconstitutional behavior if a violation of federal rights is a 'highly predictable' or 'plainly obvious' consequence of a municipality's action.'" Olsen v. Layton Hills Mall, 312 F.3d 1304, 1314 (10th Cir. 2002) (citation omitted).

Neither Iron County, Garfield County, nor the Iron/Garfield Counties Narcotics Task Force can be liable to Mr. Sherry for damages because there was no underlying constitutional violation by any of the individual police officers. See Hinton, 997 F.2d at 782. Furthermore, Mr. Sherry has not demonstrated the existence of a municipal policy or custom that was the moving force behind his alleged constitutional deprivations. See id. In other words, Mr. Sherry has not demonstrated a "causal link" between any municipal policy or custom and his alleged violated right. See id. Mr. Sherry has not presented any evidence that the municipalities or the combined county task force maintain an official policy or custom that authorizes unreasonable warrantless searches. Mr. Sherry also failed to demonstrate that any lack of appropriate training or policies by the municipalities amounted to deliberate indifference to his rights. See Harris, 498 U.S. at 388. Finally, Mr. Sherry has not shown that the Defendant governmental entities were aware of any pattern of constitutional violations by the Defendant police officers. Mr. Sherry has not marshaled any evidence from which a reasonable fact finder could conclude that his injuries were the "plainly obvious" or "highly predictable" consequence of the municipalities' action or inaction. See Olsen, 312 F.3d at 1314.

16

## IV. ORDER

For the foregoing reasons, Mr. Sherry's motion for partial summary judgment is

DENIED, and Defendants' motions for summary judgment are GRANTED.

IT IS SO ORDERED.


DATED this __11th__ day of July, 2006.

Dee Benson
United States District Judge

17